# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| JENNIFER BRICK, | Cause No. CV 2:24-00174-BMM |
| Plaintiff, | |
| vs. | **ORDER** |
| GALLATIN COUNTY, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiff Jennifer Brick ("Brick"), proceeding without counsel, filed a Third Amended Complaint alleging violations of her constitutional rights, a RICO claim, state law claims, and other federal law claims against the City of Bozeman, Gallatin County, government entities of the State of Montana, the ankle monitor company responsible for her pretrial monitoring, and numerous individual defendants, including Montana state court judges, law enforcement officers, attorneys, and her former spouse. (Doc. 48-1.) Defendant Scram Systems, Inc., moved to respond to Brick's Third Amended Complaint within 21 days of this Order. (Doc. 66.) The remaining Defendants moved to dismiss Brick's claims. (Doc. 32; Doc. 36; Doc. 38; Doc. 42; Doc. 54; Doc. 62.) Brick's Complaint fails to state a claim for relief. The Court will grant Defendants' motions to dismiss.

1

# I.  STATEMENT OF THE CASE

## A. Parties and Procedural Background

Brick filed a Complaint (Doc. 1), an Amended Complaint (Doc. 12), a Second Amended Complaint (Doc. 47) after Defendants began filing motions to dismiss, and a Motion to Amend the Second Amended Complaint (Doc. 48). The Court granted Brick's motion, accepted the Third Amended Complaint (Doc. 48-1), and denied Defendants' Joint Motion to Strike (Doc.  57).  (Doc. 59.) The Court denied Brick's Motion for Appointment of Counsel (Doc. 13).  (Doc. 17). The Court denied Brick's request to be exempted from Local Rule 7.1(c)(1) and denied Brick's motion to strike Defendants' motions to dismiss. (Doc. 59.)

Defendant Richard DuCharme ("DuCharme) (Doc. 32), Defendants City of Bozeman, Officer Lindsay Shepherd, Officer Marek Ziegler, Officer Anthony Taylor, and Officer Bryton Lutzka (Doc. 36) and Defendants Bekki McClean, Mollie Schultz, and the Honorable Karolina Tierney (Doc. 38) (collectively, "City Defendants"), Defendants Montana Court Administrator's Office, Montana Office of the State Public Defender, the Honorable Andrew Breuner, the Honorable Rienne McElyea, the Honorable Peter Ohman, the Honorable Mike McGrath, Standing Master Magdalena Bowen, Michael Sinks, Henry Westesen, and Audrey Cromwell ("State Defendants") (Doc. 42), Defendants Dodd Law Firm, Matt Dodd, and Dillon Post ("DLF Defendants") (Doc. 54), and Defendants Gallatin County, Colter

Metcalf, Bryan Adams, Madison Sharpe, Rick West, and Collin Kiewatt ("County Defendants") (Doc. 62), filed motions to dismiss Brick's claims. The Court granted Defendant SCRAM Systems additional time to respond to Brick's Third Amended Complaint. (Doc. 66.)

The Court conducted a hearing on Defendants' motions to dismiss on March 24, 2025, in Butte, Montana. (Doc. 100.) Brick then filed a Notice providing clarification of her arguments at the hearing (Doc. 102), an Emergency Motion for Leave to Issue Early Subpoenas (Doc. 103), a Motion for Injunctive Relief or Motion to Stay Appellate Proceedings (Doc. 104), a Rule 60(b) Motion and objection to Defendants' factual assertions at the hearing (Doc. 105), a Notice and Supplemental Brief regarding new authority related to judicial immunity (Doc. 112), a Notice of Brick's intention to request redaction of the hearing transcript (Doc. 124), a Motion for Preservation of Evidence (Doc. 126), a Notice of Supplemental Authority regarding a Texas Supreme Court decision (Doc. 131), and a Notice of Readiness for Ruling (Doc. 136). Defendants responded (Doc. 109, Doc. 110, Doc. 111, Doc. 113, Doc. 114, Doc. 118, Doc. 119, Doc. 130, Doc. 132, Doc. 133) and filed a joint motion for a protective order to stay discovery (Doc. 106). Brick responded to Defendants' motion for a protective order (Doc. 108) and replied to Defendants' responses to her motions and notices (Doc. 123, Doc. 127, Doc. 128, Doc. 135). Defendants filed a Notice of Plaintiff's Additional State Court Filing and Request

for Judicial Notice. (Doc. 129.) Brick filed an objection.  (Doc. 135.)

### B.  Factual Background

Brick's claims arise from proceedings related to civil disputes over the parenting plan with her former spouse, criminal proceedings against her in the Bozeman Municipal Court and the Eighteenth Judicial District Court, Gallatin County, Montana, and decisions by the Montana Supreme Court related to those proceedings. (Doc. 48-1 at 1–8.) Brick alleges that Defendants conspired to violate her civil rights, "terminate" her parental rights, and initiate criminal proceedings against her in retaliation for testifying at the Montana State Legislature in favor of HB 322, which aimed to "reform[] the state's Standing Master program."  (Doc. 48-1, ¶ 2.) Brick describes the "heart" of her claims as a conspiracy among judicial Defendants to "publicly engage[] in suppressing the protected legislative activity of parents with open cases in their district" and to take "immediate adverse administrative actions . . . to directly retaliate against [Brick]."  (Doc. 127 at 1–2.) Brick alleges a complex conspiracy:

> Defendants engaged in a deliberate and coordinated conspiracy to retaliate against Plaintiff for her First Amendment-protected testimony on judicial misconduct and family court reform. This conspiracy was designed to discredit Plaintiff, sever her parental rights, and obstruct her ability to fairly defend against fabricated allegations, leveraging judicial, prosecutorial, and law enforcement powers to achieve their shared goal.

(Doc. 48-1, ¶ 376.)

4

### 1. Brick's Factual Allegations

Brick's Third Amended Complaint alleges the following facts. Brick married Defendant Richard DuCharme in 2004. (Doc. 48-1, ¶ 71.) Brick and DuCharme share two daughters. (*Id.*) The couple divorced in 2017, and Brick received primary custody of the daughters. (*Id.*, ¶ 73.) Brick and DuCharme established a parenting plan. (*Id.*, ¶¶ 272, 275.) In October 2019, DuCharme, represented first by Scott Phelan, and later attorneys at the Dodd Law Firm (DLF Defendants), began litigation to modify the parenting plan. (*Id.*, ¶ 272.)

Standing Master Bowen presided over the parenting plan proceedings from November 2019 to November 2021. (Doc. 48-1, ¶ 273.) Brick alleges that Standing Master Bowen took various actions related to these proceedings, including issuing a warrant for Brick to appear at a contempt hearing (*id.*, ¶ 274), failing to explain the proceedings adequately, revoking Brick's holiday parenting time (*id.*, ¶ 275), issuing a "final citation" for contempt, denying Brick an opportunity to be heard during hearings (*id.*, ¶ 277), and failing to file findings of fact and conclusions of law (*id.*, ¶ 279).

Standing Master Bowen conducting a hearing to amend the parenting plan, although DuCharme and his attorney failed to file his proposed parenting plan before the hearing. (Doc. 48-1, ¶ 281.) Standing Master Bowen "allowed Mr. Dodd to make false allegations" against Brick during the hearing (*id.*, ¶ 282) and "directed Attorney

Dodd to finalize edits after the hearing" (*id.*, ¶ 285). Standing Master Bowen granted DuCharme's motion for a hearing to hold Brick in contempt for violating the parenting plan but denied Brick's "counter-contempt motion." (*Id.*, ¶ 367.) Brick argues that these actions deprived her of her due process rights and provide evidence of "the public appearance of coordination" between Standing Master Bowen, Dodd, and DuCharme. (*Id.*, ¶ 281.) Brick further argues that the family court proceedings generally exhibited "a pattern of forcing Plaintiff to face repeated allegations of 'withholding' or 'not following an Order'" by issuing orders without providing Brick with notice or an opportunity to be heard. (*Id.*, ¶ 367.)

Standing Master Bowen issued a "final order" amending the parenting plan. (Doc. 48-1, ¶ 284.) The amended parenting plan reduced Brick's parenting time, shifted childcare expenses to Brick, and allowed DuCharme to claim one child on his tax returns without Brick's consent. (*Id.*, ¶¶ 272, 287.) Brick argues that the final parenting plan "contribut[ed] to her isolation from the children and community." (*Id.*) Brick continued to attempt to litigate the final parenting plan in order to "correct the outstanding errors and ongoing misunderstanding[.]" (*Id.*, ¶ 289.) Standing Master Bowen recused herself from the proceeding. (*Id.*)

Judge Ohman took over the parenting plan proceedings, conducted a hearing "exclusively" for DuCharme, failed to include oral pronouncements from the hearing that were favorable to Brick in his written order, and directed Brick to file

an "IRS waiver." (Doc. 48-1, ¶¶ 291–94.) Judge Ohman denied DuCharme's request for full custody of the children at the same hearing. (*Id.*, ¶¶ 132, 292.) Judge Ohman later recused himself. (*Id.*, ¶ 295.)

Judge Bruener conducted a hearing and granted a motion to declare Brick a vexatious litigant. (*Id.*, ¶ 296.) Judge Bruener issued "multiple ex parte orders" granting DuCharme additional holiday parenting time. (*Id.*, ¶ 297.) Judge Bruener and DLF Defendants "engaged in a pattern of ex parte communications" and granted orders in favor of DuCharme and his attorneys. (*Id.*, ¶ 123.) Brick then began pursuing "legislative advocacy to address systemic judicial failures and protect parental rights." (*Id.*, ¶ 306.)

Brick testified in favor of HB 322, a bill to reform the standing master program, on February 7, 2023, and March 23, 2023. (Doc. 48-1, ¶ 67.) Judge Breuner testified in opposition to the bill. (*Id.*, ¶ 69.) Judge Breuner "dismiss[ed]" Brick and other parents as "emotional," described their motives as "gratuitous," and stated that the standing master program worked. (*Id.*, ¶ 69.) On March 21, 2023, Brick "met with Defendant District Attorney Cromwell and Commissioner Boyer to address judicial misconduct and due process violations in post-divorce family court, naming Standing Master Bowen and opposing counsel Matt Dodd." (*Id.*, ¶ 81.)

On April 19, 2023, Defendant Schultz filed a criminal complaint against Brick for custodial interference related to the previous dispute over holiday parenting time.

(Doc. 48-1, ¶ 2.) Brick argues that this charge lacked probable cause and that she did not receive proper notice of the charge. (*Id.*, ¶¶ 2, 85–86.) The Montana Legislature passed HB 322 on May 18, 2023. (*Id.*, ¶ 70.) A bench warrant was issued for Brick's arrest after a hearing on the custodial interference charge took place on May 22, 2023. (*Id.*, ¶ 86.) Brick filed a petition to enforce DuCharme's financial support obligations in the Montana state Gallatin County District Court. (*Id.*, ¶ 88.) Judge Breuner issued an "additional ex parte order" without notice to Brick on June 15, 2023. (*Id.*, ¶ 586.)

Brick contacted law enforcement and requested a welfare check for her daughters on June 19, 2023, because the "location services" on the daughters' cellphones had been disabled. (Doc. 48-1, ¶ 89.) Deputy Keiwatt responded to Brick's home and "attempt[ed] to arrest [Brick] without disclosing the bench warrant" for custodial interference. (*Id.*, ¶ 90.) Brick's daughters learned about the bench warrant from the responding law enforcement officers and DuCharme. (*Id.*, ¶ 91.) The daughters were distressed. (*Id.*)

Brick met her daughter at the Bozeman Swim Center the following day, "confiscated the phone she owned and supervised for the minor child's use, and returned home." (Doc. 48-1, ¶ 92.) The Complaint does not describe the events of the "mother-daughter phone interaction." (*Id.*, ¶ 240). Brick instead characterizes the

actions she took to confiscate the cellphone as "discipline with necessary force" of her daughter. (*Id.*, ¶¶ 104, 246, 353.)

Brick's daughter left the Bozeman Swim Center and went directly to police to report the "phone interaction." (Doc. 48-1, ¶¶ 235, 239.) Officer Shepherd and Officer Lutzka interviewed the daughter, arrested Brick, and charged Brick with assault. (*Id.*) Brick alleges she owned the cellphone, but officers concluded that DuCharme and their daughter owned the cellphone. (*Id.*, ¶ 95.) Brick alleges that officers found no evidence of physical harm to her daughter. (*Id.*, ¶ 249.) Officer Shepherd "ma[de] calls, communicat[ed] on her cellphone, and typ[ed] on her computer" on the day of Brick's arrest. (*Id.*, ¶ 108.)

Brick argues that law enforcement officers failed to evaluate whether the "fear" Brick caused her daughter rose to the level of assault or fell within appropriate parental "discipline." (Doc. 48-1, ¶ 353.) Officers "issued a non-judicial 60-hour 'No Contact' Order prohibiting [Brick] from contacting her children[.]" (*Id.*, ¶ 99.) DuCharme, accompanied by a law enforcement officer, collected items and pets from Brick's home while Brick was detained. (*Id.*, ¶ 109.)

Prosecutors ultimately charged Brick with making a false report, assault, custodial interference, and unlawful restraint. (Doc. 48-1, ¶ 243.) Brick was convicted of assault and making a false report after two jury trials. (*Id.*, ¶¶ 256–57.) The other charges were dismissed. (*Id.*) Brick argues that "[b]oth trials were riddled

with prosecutorial misconduct, including Brady violations, improper jury instructions, and the use of fabricated or suppressed evidence, and by deliberately ignoring exculpatory evidence, and suborned perjury of a minor, and of law enforcement." (*Id.*, ¶ 252.) Brick's appeals of the two convictions remain pending. (*Id.*) Brick argues that the assault statute is vague, contradicts the parental right to discipline, and disregards the right to protect her personal property. (*Id.*, ¶¶ 103–04.)

DuCharme filed a petition for a temporary order of protection for the daughter on June 21, 2023, based on the daughter's police report. (*Id.*, ¶¶ 100, 117–19.) Judge Breuner "created" a "quasi-criminal case" for these issues, "assigned himself" to it, and granted DuCharme's petition. (*Id.*, ¶¶ 116, 118.) Brick alleges that DuCharme, DLF Defendants, police, and prosecutors tampered with a witness by interviewing the daughter while she was under duress and later coaching her to provide false testimony during both civil and criminal proceedings. (*Id.*, ¶¶ 249, 252, 257, 340.)

Judge Breuner extended the no-contact order for one daughter to two years and issued a 60-day protective order for the other daughter on July 14, 2023, "effectively severing [Brick's] connection to her children and community." (Doc. 48-1, ¶¶ 139, 129.) Judge Breuner did not allow Brick an opportunity to speak at the hearing. (*Id.*, ¶ 128.) Brick filed a notice of appeal for the protective order with the Montana Supreme Court on August 12, 2023. (*Id.*, ¶ 144.)

10

DuCharme "failed to block [Brick's] number" on her daughter's cellphone. (Doc. 48-1, ¶ 147.) Brick accidentally called the daughter and canceled the call on August 18, 2023. (*Id.*, ¶¶ 146, 150.) DuCharme reported the call to police. (*Id.*, ¶ 146.) Defendant Sgt. Metcalf "arrived at [Brick's] home without a warrant, demanding she answer the door and engaging in harassing conduct for three hours, including excessive calls, texts, and contacting her workplace." (Doc. 148.) Brick was charged with obstruction and violating the protective order. (*Id.*, ¶¶ 146, 149.) Montana state district Judge McElyea issued an insufficiently detailed search warrant that officers executed "improperly." (*Id.*, ¶ 149.)

DuCharme and his attorneys "presented a false narrative to the court to justify excessive pretrial conditions" such as an "excessive" $20,000 bail and a GPS ankle monitor that "exceeded statutory guidelines[.]" (Doc. 48-1, ¶ 10.) Male defendants at the same hearing received lower bail amounts. (*Id.*, ¶ 158.) Brick alleges that the ankle monitor caused her "severe" medical harm, open wounds, and numbness, and her pretrial officer failed to take "meaningful action" to address the injuries. (*Id.*, ¶ 208–09.) Brick's parents helped Brick post bond. (*Id.*, ¶ 160.) Brick later requested removal of the GPS monitor, but Judge West upheld Brick's pretrial conditions. (*Id.*, ¶ 210.) The GPS monitor malfunctioned, and Brick was detained for having violated her pretrial conditions. (*Id.*, ¶¶ 213–17.)

11

Judge Breuner issued an "ex parte non-emergency order" allowing Officer Taylor and DuCharme to search Brick's home and remove possessions. (*Id.*, ¶ 163.) Officer Taylor, "in coordination with [DuCharme's] attorneys," charged Brick with violating the protective order in connection with the search. (*Id.*, ¶ 164.) Brick argues that protective orders are "typically meant to protect individuals from violent males" and that Defendants improperly "exploited" the protective order to obtain Brick's personal property. (*Id.*, ¶ 164.)

The charges of violating the protective order served as the basis for "indefinitely" extending the 60-day order of protection for Brick's other daughter. (Doc. 48-1, ¶¶ 176–77.) Brick filed a motion to disqualify Judge Breuner and filed a complaint with the Judicial Standards Commission, "citing violations of her constitutional rights, including lack of notice, due process, and statutory safeguards in the termination of her parental rights." (*Id.*, ¶ 172.) The Montana Supreme Court, in an opinion authored by Chief Justice McGrath, considered Brick's due process argument and evidence of Judge Breuner's alleged bias, including his testimony against HB 322, and denied Brick's motion. (*Id.*, ¶ 173.) Brick filed a writ in the Montana Supreme Court challenging the order of protection, but the writ was denied. (*Id.*, ¶ 264.) Brick argues that the order of protection constituted a termination of her parental rights. (*Id.*, ¶¶ 244, 250, 350.)

Brick chose to proceed pro se in her criminal cases after her public defender caused delays, failed to hire a forensic video expert, and "fail[ed] to protect her parental rights." (Doc. 48-1, ¶ 207.) Brick was convicted of "false report" following a trial on January 18, 2024. (*Id.*, ¶ 256.) Brick challenged the jurisdiction of the justice court and argued that the charges related to a family law civil matter. (*Id.*) Brick alleges numerous procedural defects, including speedy trial violations, erroneous jury instructions, and the prosecutor's failure to recognize exculpatory evidence. (*Id.*) Brick was convicted of "Assault – Creating Fear" on February 2, 2024. (*Id.*, ¶ 257.)

Judge McElyea or Judge Breuner "assigned" Judge McElyea to Brick's appeals of her criminal convictions. (Doc. 48-1, ¶ 340.) Brick alleges that she experienced further retaliation because Judge McElyea served on a judicial panel for a legislative committee, and Judge McElyea's presence intimidated her. (*Id.*, ¶ 267.) Brick alleges that Judge McElyea and Chief Justice McGrath intentionally delayed ruling on her appeals. (*Id.*) In January 2024, Brick filed "[f]raud-related motions," but these "were ignored without substantive review[.]" (*Id.*, ¶ 332.) Brick "attempted to exhaust state remedies" in pursuit of her constitutional claims before filing her Complaint in this Court. (*Id.*, ¶¶ 333–34.)

13

## 2. Brick's Montana State Court Proceedings

Standing Master Bowen issued a Final Amended Parenting Plan in January 2021. (Doc. 34-1 at 3.) Brick continued to file motions related to the parenting plan, and the Eighteenth Judicial District Court of Montana denied Brick's motion to amend the Final Parenting Plan. (*Id.* at 4.) The Montana state district court denied Brick's pending motions and declared her a vexatious litigant. (*Id.*) Brick appealed. The Montana Supreme Court affirmed. (*Id.* at 2.)

Brick was arrested on June 20, 2023, and charged with Partner Family Member Assault – Causing Reasonable Apprehension of Bodily Injury under Montana Code Annotated § 45-5-206(1)(c), Unlawful Restraint under § 45-5-301; and Interference with Parent-Child Contact under § 45-5-631. (Doc. 34-7 at 1–2.) Ducharme filed for a temporary order of protection on behalf of their two daughters. (Doc. 34-2 at 3.) The Montana state district court granted the petition and, after a hearing on July 12, 2023, granted a two-year protective order for one daughter and a six-month protective order for the other. (*Id.*) The Montana state district court extended the six-month protective order based on the allegations that Brick violated the protective order. (*Id.* at 3–4.) The Montana Supreme Court affirmed. (*Id.*) Brick's appeal presented the issues of judicial bias, entrapment, misuse of court orders, violations of Brick's due process rights, prosecutorial misconduct, ineffective assistance of counsel, and erroneous and excessive sentencing. (*Id.*)

14

Brick moved to disqualify Judge Breuner for bias. (Doc. 34-23.) Brick alleged that Judge Breuner issued "ex parte" orders in favor of DuCharme, issued the protective orders in retaliation for Brick's legislative testimony in favor of HB 322, and improperly removed custody of her children. (*Id.*) Judge Breuner referred the motion to the Montana Supreme Court, and it denied the motion. (Doc. 34-3.)

Brick challenged her pretrial conditions by filing a petition for a writ of habeas corpus with the Montana Supreme Court. (Doc. 34-8.) Brick argued that the $20,000 bond was excessive and that the GPS ankle monitor violated her constitutional rights, exceeded statutory guidelines, and caused her "physical, emotional, and psychological torture." (*Id.*) Brick detailed the medical harm caused by the monitor, its malfunction, and her subsequent arrest. (*Id.*) Brick alleged that DuCharme was "paying the court to kidnap [Brick's] children" and that the use of the ankle monitor discriminated against smaller women. (*Id.* at 5–6.) Brick argued that the ankle monitor malfunction allowed law enforcement to create false charges against her. (*Id.*) The Montana Supreme Court denied the petition. (Doc. 34-4.)

Brick filed a petition for writ of mandamus with the Montana Supreme Court to force Judge Tierney to vacate Brick's conviction. (Doc. 34-35.) Brick argued that her legislative testimony and opposition to Judge Breuner led to retaliatory criminal charges and a trial tainted by prosecutorial misconduct, *Brady* and speedy trial

violations, suborned perjury, and other constitutional violations.  (*Id.*) Brick argued that the charges criminalized a civil family matter. (*Id.* at 3.)

Brick also filed a petition for a writ of mandamus against Judge Breuner, the Eighteenth Judicial District Court of Montana, and Chief Justice McGrath. (Doc. 34-26.) This petition sought to disqualify Judge Breuner and Chief Justice McGrath, vacate orders from Judge Breuner and Standing Master Bowen, bring "charges" against Dodd Law Firm attorneys, and return Brick's daughters to her custody, among other remedies. (*Id.*)  Brick alleged a conspiracy to terminate Brick's parental rights, remove her possessions, and deny her due process in retaliation for her legislative advocacy.  (*Id.* at 10.) The Montana Supreme Court denied the petitions. (Doc. 34-5; Doc. 34-6.)

Brick filed a motion for injunctive relief in this Court to enjoin her Montana state criminal appeals "to prevent further irreparable harm caused by the continuation of an appellate process that is structurally incapable of resolving the constitutional violations already alleged before this Court." (Doc. 104 at 1.) Brick also filed a "Notice to the Court Regarding Federal Civil Rights Case, Conflict of Interest, Inadequate State Forum, and Preservation of Rights in the Montana Eighteenth Judicial District Court" to inform the court handling the appeal of her criminal conviction that she filed a lawsuit in this Court seeking, among other remedies, injunctive relief for her appeal. (Doc. 129 at 5–6 ("Notice to the Court,"

16

Eighteenth Judicial District Court of Montana, Gallatin County, Cause No. DC-2024-222, May 1, 2025).)  Brick explained that she filed the Notice because "[t]he claims in the federal action arise out of the same underlying set of facts as this appeal and challenge the constitutionality of the conduct that led to the conviction." (*Id.* at 6.)

## II.   LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint violates Rule 8 and must be dismissed when it is "needlessly long . . . highly repetitive, or confused, or consist[s] of incomprehensible rambling." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1059 (9th Cir. 2011) (internal quotations and citations omitted).   A complaint must be plausible under Rule 8(a)(2) to survive a motion to dismiss under Rule 12(b)(6).  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

A court accepts all facts alleged in the complaint as true when considering a motion to dismiss under Rule 12(b)(6) and draws inferences in the light most favorable to the non-moving party. *Barker v. Riverside Cnty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009). The court need not accept as true, however, a "legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint

must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678 (quotations omitted).

A court must dismiss a complaint under Rule 12(b)(6) if the complaint does not state a claim upon which relief can be granted. *Mendiondo v. Centinela Hospital Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A court may dismiss a complaint "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A court must liberally construe the pleadings when a plaintiff represents himself. *Draper v. Rosario*, 836 F.3d 1072, 1080 (9th Cir. 2016).

A court may take judicial notice of court filings and other matters of public record when considering a motion to dismiss. *Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir.1998). A court's notice does not extend to disputed factual matters contained within those filings. *Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1072 (S.D. Cal. 2021).

## III. DISCUSSION

Brick alleges that Defendants collectively orchestrated a "vindictive campaign of retaliation and punishment[.]" (Doc. 48-1, ¶ 1.) Brick's Complaint fails to provide sufficient factual support, however, to apprise the numerous Defendants of the specific allegations against them. The factual allegations also fail to support a

cause of action and demonstrate that Brick seeks to relitigate matters already adjudicated, or pending final resolution, in Montana state courts.

### A.    Failure to State a Claim

Brick's Third Amended Complaint fails to state a claim for relief under Federal Rules of Civil Procedure 8 and 12. As an initial matter, Brick has not met the basic requirements of Rule 8. Rule 8 requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). A court may dismiss a complaint under Rule 8 if the complaint is so conclusory or confusing that a defendant cannot reasonably frame a responsive pleading. *Hearns v. San Bernadino Police Dep't*, 530 F.3d 1124, 1130–32 (9th Cir. 2008). Although "the proper length and level of clarity for a pleading cannot be defined with any great precision," a court may consider that an extraordinarily lengthy and confusing complaint prevents defendants from discerning which allegations give rise to particular causes of action. *Id.*

Brick's Third Amended Complaint ("Complaint") exceeds 200 pages and does not clearly state the factual basis for the allegations against each Defendant. Brick refers to "ex parte" orders and motions, policies, warrants, conspiracies, discriminatory actions, and general allegations of deprivation of rights. (Doc. 48-1.) In doing so, Brick's Complaint frequently fails to allege which Defendant acted to produce these consequences and in what manner. Brick argues that the complexity

of her allegations justifies the length of the Complaint, but Brick mistakes lengthy descriptions of legal conclusions for detailed factual support. (Doc. 70 at 27–28.) The Complaint often refers to actions of "Defendants" collectively, which forces each Defendant to guess which of the nearly thirty named Defendants should respond to the allegation.

Defendants cannot respond adequately to the Complaint without understanding the specific allegations underlying the legal conclusions posited by Brick. Defendant Bekki McLean's name, for example, appears in one paragraph of the Complaint, which notes only that McLean is the Chief Prosecutor for the City of Bozeman. (Doc. 48-1, ¶ 49.) The Complaint alleges that "court administrators and supervising judges were aware of systemic deficiencies in judicial oversight but failed to act" to cure Brick's constitutional allegations. (*Id.*, ¶ 653.) The Complaint fails to describe what role the Montana Court Administrator's Office played, or failed to play, in Brick's claims. The Complaint does not suffice to inform Defendants of the allegations against them and fails to comply with Rule 8.

Even if Brick's Complaint met the requirements of Rule 8, none of the facts Brick alleges state a plausible claim for relief under Rule 12. Brick's Complaint describes the foundation of her allegations as "a vindictive campaign of retaliation and punishment" occurring "[a]fter [Brick] exercise[ed] her First Amendment right to speak freely on a matter of public concern[.]" (Doc. 48-1, ¶ 1.) Brick's factual

allegations do not support this conclusion.

Brick first offers no connection between any of allegations related to proceedings that occurred before her advocacy for HB 322 on February 7, 2023, and the alleged conspiracy to suppress her right to free speech in "retaliation" for her Legislative testimony. (Doc. 48-1, ¶ 1.) Brick alleges that she first "began legislative advocacy" in December 2022, but Brick does not describe this phase of her legislative advocacy or allege that any Defendant knew about it. (Doc. 48-1, ¶ 306.) Standing Master Bowen's involvement in Brick's parenting plan proceedings, for example, ended in November 2021 when Bowen recused herself. (Doc. 48-1, ¶ 289.) DuCharme's litigation of the parenting plan with the aid of DLF Defendants began in 2019. (*Id.*, ¶ 272.) Those Defendants could not have retaliated against Brick for her 2023 legislative testimony or conspired with others to do so during proceedings conducted before that testimony, or any other form of public advocacy, had taken place.

Brick also fails to allege any facts connecting her testimony at the Montana State Legislature to subsequent events surrounding her family law proceedings, arrest and criminal prosecutions, protective orders, or any other events in the Complaint. Brick alleges that Judge Breuner appeared at legislative hearings, advocated against HB 322, and spoke negatively about the bill's proponents. Brick offers no facts to suggest that Judge Breuner's decisions in Brick's legal matters or

the actions of any other Defendant stemmed from the desire to retaliate against Brick for Brick's testimony in favor of HB 322. Brick relies instead on the timing of the passage of HB 322 and her arrest: "Defendants' actions began immediately after Plaintiff's testimony[.]" (Doc. 48-1, ¶ 389; see also, ¶¶ 80–91 ("Free Speech Retaliation Timeline").) Brick argues that the "adverse actions" stemming from her arrest and prosecution "occurred in close temporal proximity to [Brick's] legislative testimony and advocacy, which implicated Defendants' misconduct." (*Id.*, ¶ 344.)

To establish a connection between a defendant's actions and retaliatory conduct based solely on timing, the temporal proximity must be "very close." *Pringle v. Wheeler*, 478 F. Supp. 3d 899, 916 (N.D. Cal. 2020). In *Pringle*, for example, an employee reported racial harassment at work in an email four days before a disciplinary meeting. *Id.* Critically, the defendant in *Pringle* knew about the email. *Id.* Brick does not allege that any Defendant apart from Judge Breuner and Judge McElyea knew about her advocacy for HB 322. (Doc. 48-1, ¶ 603.) Brick fails to offer any facts suggesting that Defendants took "adverse actions" against Brick because they wished to retaliate against her for her testimony. The timing of Brick's legislative advocacy in February and March 2023 also offers a less convincing temporal connection to Brick's arrest on June 20, 2023, than her daughter's report to police and Brick's arrest "within an hour" of the cellphone interaction at the Bozeman Swim Center that same day. (*Id.*, ¶ 93.)

Brick attempts to join Defendants in a conspiracy by alleging that one might benefit from the actions of another. For example, Brick concludes that "[a]rresting [Brick], using the bench warrant as pretext, and removing custody from [Brick], would give [DuCharme] and Attorneys advantage over their open civil case against [Brick]." (Doc. 48-1, ¶ 249.) Brick also alleges that DuCharme and his attorneys knew Brick could not afford a $20,000 bond and "used the excessive bail to prolong her detention and gain an advantage in their civil family law case against [Brick]." (*Id.*, ¶ 159.) DuCharme and his attorneys did not investigate or arrest Brick, impose pretrial conditions, or even report the assault allegations to police. (*Id.*, ¶ 236.) Brick admits that her daughter went directly from the "phone interaction" at the Bozeman Swim Center to the police, presumably without a cellphone with which to contact DuCharme. (*Id.*, ¶ 235.) The Court acknowledges that Brick's arrest for assaulting her daughter likely gave DuCharme an advantage in the parenting plan litigation, but the facts alleged by Brick do not constitute a conspiracy between DuCharme and other Defendants to deprive Brick of her civil rights or establish that DuCharme acted "under color of law." (See, e.g., *id.*, ¶ 461.)

A further example lies in Brick's characterization of "gender animus." Brick argues that the use of statutory domestic violence protections, such as orders of protection and the charge of assaulting a family member, against Brick as a mother, run contrary to the statute's intention to protect a "woman from physical harm." (*Id.*,

¶¶ 250, 340, 345, 353.) Brick argues that the application of the assault charge and orders of protection against Brick reveals Defendants' desire to discriminate and retaliate against her on the basis of gender. (*Id.*) No facts support the assertion that women are exempted from the crime of assaulting a family member or that an order of protection should not be issued against a woman. No facts support the assertion that Defendants acted intentionally to discriminate against Brick because of her gender. The Court accepts all factual allegations as true when considering Defendants' motions to dismiss, but it need not accept Brick's bare conclusions that Defendants acted in concert to deprive her of due process, discredit her, "terminate" her parental rights, and isolate her from her community. Brick's Complaint fails to state a claim for relief.

## B.    Abstention under *Rooker-Feldman*

Defendants assert various other arguments in their motions to dismiss Brick's claims, including collateral estoppel, res judicata, prosecutorial and judicial immunity, and Brick's failure to state a cognizable wrong. All Defendants argue that the Court lacks jurisdiction to hear Brick's claims under the *Rooker-Feldman* doctrine. The Court agrees. Even if Brick's Third Amended Complaint had stated sufficient factual matter to survive a motion to dismiss under Rule 12, the facts Brick does allege require the Court to abstain from adjudicating issues already litigated in Montana state courts. Brick's Third Amended Complaint presents identical facts and

24

issues to those already adjudicated in Brick's various Montana court proceedings, and Brick acknowledges as much.  (Doc. 104, Doc. 129.)

The Rooker Feldman doctrine "stands for the relatively straightforward principle that federal district courts do not have jurisdiction to hear de facto appeals from state court judgments." *Carmona v. Carmona*, 544 F.3d 988, 995 (9th Cir. 2008).  Federal district courts "do not have jurisdiction . . . over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional."  *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 486 (1983). A district court applies the following test to determine if *Rooker-Feldman* divests its jurisdiction:

> If claims raised in the federal court action are "inextricably intertwined" with the state court's decision such that the adjudication of the federal claims would undercut the state ruling or require the district court to interpret the application of state laws or procedural rules, then the federal complaint must be dismissed for lack of subject matter jurisdiction.

*Bianchi v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir. 2003). Unlike res judicata, which looks to the preclusive effect of state court judgments, *Rooker-Feldman* examines "whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment." *Bianchi*, 334 F.3d at 900.

In *Bianchi*, the Ninth Circuit cited the Fifth Circuit's analysis of *Howell v. Supreme Court of Texas*, in which the plaintiff argued that the refusal of the Texas

Supreme Court justices to recuse themselves constituted a due process violation. *Bianchi*, 334 F.3d at 901 (citing *Howell v. Supreme Court of Texas*, 885 F.2d 308 (5th Cir.1989)). There, like in Brick's case, the due process argument "was implicit" in the plaintiff's motion to recuse, which was analyzed and rejected by the Texas Supreme Court. *Id.* at 902.

Brick repeatedly summarizes the basis of her claims as a conspiracy among Defendants to deprive Brick of her civil rights, terminate her parental rights, and discredit her in retaliation for testifying in favor of HB 322. (See, e.g., Doc. 48-1, ¶¶ 1–18; Doc. 104 at 3–7; Doc. 135 at 5; Doc. 70 at 2.) The same claims, arguments, and facts appear in Brick's numerous Montana state filings. (See, e.g., Doc. 34-1; Doc. 34-2; Doc. 34-25; Doc. 34-26.) The Complaint states outright that Brick attempted to exhaust state remedies for these issues before bringing the same claims to this Court. (Doc. 48-1, ¶¶ 267, 318, 334.) Brick's claims are inextricably intertwined with Montana state court judgments.

Rooker-Feldman prevents a plaintiff from attempting to "undo" a state court judgment. The relief sought by the plaintiff guides the court's ultimate decision. *Bianchi*, 334 F.3d at 900. Brick seeks relief "for the total termination of her parental rights," which would necessarily require the Court to determine that the Montana state courts terminated Brick's parental rights and did so in violation of Montana law. (Doc. 48-1, ¶ 30.) More worrisome is Brick's request for "injunctive relief or

26

measures to ensure impartial and timely resolution of her appeals," which would require the Court to interfere in two cases pending appeal in the Montana state courts. (*Id.*, ¶ 326; Doc. 104.) To grant Brick's requested relief would implicate directly the "principles of federalism and comity that underlie the *Rooker–Feldman* doctrine." *Bianchi*, 334 F.3d at 902.

> In response to Defendants' *Rooker-Feldman* arguments, Brick argues that:
>
> A criminal-based termination of parental rights—effectuated through a criminal charge and an order of protection on a minor child, without any civil termination proceeding and requiring two separate appeals, neither of which directly adjudicated the parental rights at issue—does not constitute a full and fair adjudication under federal due process standards, and therefore cannot bar subsequent constitutional claims.

(Doc. 134 at 3–4.) *Rooker-Feldman* "does not require [a court] to determine whether or not the state court fully and fairly adjudicated [a] constitutional claim." *Bianchi*, 334 F.3d at 900. Brick asks this Court to do what *Rooker-Feldman* prohibits: review the civil and criminal proceedings leading to the "termination" of her parental rights and determine that the Montana state courts failed to follow procedural rules or correctly apply statutes.

## III.  CONCLUSION

The Court has determined that the Court lacks jurisdiction to adjudicate Brick's claims, that Brick's Complaint fails to state a plausible claim for relief under Rule 12 of the Federal Rules of Civil Procedure, and that Brick's Complaint fails to

meet the requirements of Rule 8. The Court grants Brick leave to amend her Complaint to state a claim for relief and to comply with Rule 8. The Court again reminds Brick that she must comply with all Local Rules as well as the Federal Rules of Civil Procedure. Brick's filings frequently exceed page limits, disregard procedural requirements, and cite to non-existent cases to support Brick's legal contentions. (*See, e.g.*, Doc. 70 at 19 ("*Curtis v. Trevino*, 631 F.3d 880 (9th Cir. 2011)"); Doc. 70 at 24 ("*Koch v. Schapiro*, 699 F.3d 141, 145 (2d Cir. 2012)"); Doc. 70 at 37 ("*Frenchko v. Trumbull County*, 85 F.4th 279 (6th Cir. 2023)"); Doc. 70 at 50 ("*Hayek v. Hayek*, 2019 WL 2992049 (S.D.N.Y. 2019)").)  Failure to comply with these rules, including continued misrepresentations to the Court, will result in dismissal.

Because the Court will grant Defendants' motions to dismiss, the Court need not consider Brick's remaining motions.

Accordingly, it is HEREBY ORDERED:

1. Defendants' motions to dismiss (Doc. 32; Doc. 36; Doc. 38; Doc. 42; Doc. 54; Doc. 62) are **GRANTED**.

2. Brick's claims are **DISMISSED** without prejudice.

3. Brick may file an amended complaint on the form to be provided by the Clerk of Court's Office.  The complaint must comply with Rule 8 of the Federal Rules of Civil Procedure. If no complaint is filed on or before July 31, 2025, the case

will be closed.

4. The Clerk of Court is directed to provide Brick with a copy of the complaint form.

5. Brick's remaining Motions (Doc. 103; Doc. 104; Doc. 105; Doc. 126) are **DENIED** as moot.

6. Defendants' joint motion for a protective order (Doc. 106) is **DENIED** as moot.

DATED this 27th day of May, 2025.

_____
Brian Morris, Chief District Judge
United States District Court